NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0605n.06

No. 11-1712

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Jun 26, 2013**
DEBORAH S. HUNT, Clerk

WILLIE SANDERS,

    Petitioner-Appellant,

v.

CINDI S. CURTIN, Warden,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before: BOGGS, ROGERS, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. Petitioner Willie Sanders was charged with the first-degree murder of Clarence McFerrin. Following a bench trial, Sanders was found guilty and sentenced to life in prison without the possibility of parole. His original trial counsel filed a motion for new trial, claiming that the conviction was against the great weight of the evidence and that newly discovered evidence warranted a new trial. The trial court denied the motion, and newly appointed counsel appealed. The Michigan Court of Appeals affirmed, and the Michigan Supreme Court denied leave to appeal. In 2003, a different attorney filed a motion for relief from judgment, raising a number of claims, including allegations that the prosecution suppressed a police report prepared during trial that contained exculpatory evidence; that a witness's in-court identification of Sanders at the preliminary examination was unnecessarily suggestive; and that Sanders received

-1-

ineffective assistance of counsel at trial and on direct appeal. The state trial court denied relief and

the state appellate courts denied leave to appeal. Sanders then sought habeas corpus relief in federal

district court, raising the same issues as those raised in his motion for relief from judgment. The

district court denied relief, but granted a certificate of appealability on the above-referenced issues.

This appeal followed. For the following reasons, we **AFFIRM** the judgment of the district court.

## FACTUAL BACKGROUND

### I.  State Court Proceedings

On January 8, 1997, two shootings occurred in Kalamazoo, Michigan. Around 10:00 p.m.,

Edward Patterson was shot by James Camble.[1] Clarence McFerrin was killed approximately an hour

later in the same vicinity. The previous day, Jeffery Fry had been assaulted, and Camble was

implicated as the perpetrator. These incidents were allegedly the result of feuding between two rival

gangs—one based in Chicago, of which Sanders, James Camble, Ronald Wymes, Antoinne Riley,

and Michael Lemon were members, and one based in Kalamazoo, of which the victim McFerrin,

Jeffery Fry, Troy Elliot, Edward Patterson, and Darlynzo Brown[2] were members. Initially, Michael

Lemon was a suspect in the McFerrin shooting because he was an associate of James Camble and

matched the general description of the shooter. Although authorities made contact with him early

on in the investigation, Lemon purportedly left for Chicago and did not return to Kalamazoo.

---

[1]Camble's last name is spelled "Campbell" at certain points in the trial transcript. His street name, "Little Wolf," is also used.

[2]His name is spelled "Darlynnzo" at certain points.

-2-

An unnamed witness stated that Antoinne Riley, an associate of Lemon and Camble, was seen entering a light blue Buick in the vicinity of the shooting several hours earlier. Officer testimony indicated that Sanders was pulled over several days later in a light blue Buick. Because he had no license and gave a false name to the police, Sanders was arrested for obstruction by disguise and for outstanding traffic warrants and subsequently became a suspect in the McFerrin shooting. At that point, no one had identified Lemon as the perpetrator; additionally, the people who later suggested that Lemon might be the shooter were not present when the shooting occurred.

Darlynzo Brown testified that on the evening of the shooting, McFerrin was driving a car in which he and Troy Elliot were passengers—Brown was in the front seat and Elliot in the back. McFerrin stopped at Brown's house on Woodbury Street so that Brown could retrieve something from inside. Brown passed his aunt, Thelma Fry, on the way into the house. As he returned to the car, a man approached him and inquired about drugs; the man followed Brown as he reentered the car and also asked McFerrin about drugs. The perpetrator then fired shots into the car, killing McFerrin. Brown testified that he saw James Camble nearby, but that he was not the shooter. Brown claimed that he initially identified someone other than Sanders as the shooter in a photographic lineup because he wanted to seek revenge against Sanders himself.

Troy Elliot's recollection of the shooting largely tracked that of Brown, and he also claimed to have purposefully identified someone other than Sanders so that he could avenge McFerrin's death himself; however, following police confiscation of his firearm, Elliot informed the authorities that Sanders was responsible for the shooting.

Jeffery Fry testified that he saw Sanders sitting on a fence before the shooting and that he also saw him in the area after the shooting; however, Fry did not witness the shooting. He also claimed that he informed the police that someone else was the shooter because he wished to kill Sanders himself.

Thelma Fry—Darlynzo Brown's and Jeffery Fry's aunt—testified that she witnessed the shooting from her porch. She previously identified Sanders and another individual as resembling the shooter in a photographic lineup and also identified Sanders at a preliminary examination. She identified Sanders as the shooter at trial.

Monique Camble, James Camble's sister, testified that Sanders stayed at her house the night of the shooting and that several individuals from the Chicago group came and went that night. Although Sanders was also in and out during the course of the evening, Monique claimed that he never left with James Camble, Antoinne Riley, and Michael Lemon.

Detective Steven Ouding testified that photographic lineups were conducted with pictures of Sanders, Camble, and Lemon. Camble was identified as Patterson's shooter. Although Darlynzo Brown stated that Lemon resembled McFerrin's shooter, Brown did not positively identify Lemon as the shooter. There were plans to conduct a live lineup—which would have included Sanders—for Thelma Fry, Jeffery Fry, Darlynzo Brown, and Troy Elliot to view, but it did not occur. Instead, the four witnesses were each shown a photographic lineup. Detective Greggory Hatter stated that Thelma Fry was the only person to indicate that Sanders's photo resembled the suspect, although she ultimately did not make a positive identification. Everyone except Brown indicated that the individual in photograph 4 resembled the shooter, but none of them were sure that he was the

shooter. The person in photograph 4, however, was incarcerated at the time of the shooting. Because the witnesses had focused on this person, Detective Hatter suspected that they were not being truthful. Darlynzo Brown spoke subsequently with the detective and indicated that he had lied, and that Sanders was the actual shooter. Elliot likewise recanted his previous identification and implicated Sanders.

After Sanders was charged with the murder, he gave conflicting statements to the police. In the first statement, he denied being at Monique Camble's house on the night of the shooting and did not mention that Lemon was the shooter. In the second, he claimed that he was at Monique's house and that Lemon, Riley, and James Camble came over, at which time Lemon bragged about shooting McFerrin.

The defense proceeded on the theory that someone else—namely, Michael Lemon—was responsible for McFerrin's murder. Monique Camble's ex-boyfriend, Rosco Manns (who was also Michael Lemon's cousin), testified that he was with Sanders at Monique's house on the night of the shooting. He claimed that Lemon, Riley, and James Camble came to the house; that Lemon claimed he had shot someone; and that Lemon wrapped the gun in a bag in order to bury it. On cross-examination, Manns denied telling police that Sanders was with the other three men when they arrived at Camble's house.

Lee Logan stated that he was on a porch a few doors down from where the shooting took place and that Sanders was not the shooter.

Tamica Cohen, the mother of one of McFerrin's children, testified that although she did not witness the shooting, she saw James Camble and a short man running through an alley off Woodbury

Street toward a house in which women named Noonie and Tara lived. She claimed that they entered a small red car and drove away. She testified that the man with Camble was not Sanders.

The trial court ultimately found Sanders guilty and imposed a mandatory life sentence. Sanders's trial counsel filed a motion for new trial, contending (1) that the conviction was against the great weight of the evidence and (2) that newly discovered evidence undermined the conviction. The newly discovered evidence consisted of testimony by James Camble at a hearing on the motion. He claimed that he had lied to police when he said he was not at the scene of the shooting and that he was actually 50 feet away and saw the back of the shooter, who was not Sanders. Camble declined to identify the actual perpetrator, however, and invoked the Fifth Amendment multiple times. The motion was denied by the trial court, which found Camble's testimony to be "inherently unreliable" based on his untruthfulness during the original investigation and his close relationship with Sanders. *See People v. Sanders*, No. 207546, 2001 WL 1547916, at *1-2 (Mich. Ct. App. Nov. 30, 2001) (per curiam). The court also found ample evidentiary support for the conviction.

Sanders, through new counsel, raised the same issues on direct appeal. The Michigan Court of Appeals affirmed the trial court's decision, and the Michigan Supreme Court denied leave to appeal. *See Sanders*, 2001 WL 1547916, *leave to appeal denied by People v. Sanders*, 650 N.W.2d 338 (Mich. 2002).

Sanders then filed a motion for relief from judgment, contending that: (1) he was denied his right to a fair trial based on the prosecutor's failure to timely disclose *Brady* material or, alternatively, that the prosecutor's failure to provide the defense with a police report in a timely manner resulted in a violation of his due process rights; (2) his trial counsel was ineffective for

making several outcome-determinative errors; (3) Thelma Fry's in-court identification during the preliminary examination was unnecessarily suggestive and violated his due process rights; (4) he was denied effective assistance of appellate counsel on direct appeal where his counsel failed to raise "dead bang winners" and properly develop the two issues presented; (5) the trial court abused its discretion in failing to consider his polygraph results, which violated his due process rights; and (6) his right to a fair trial was violated based on prosecutorial misconduct.

The court held several hearings on the issue of whether a September 9, 1997 report prepared by Detective Hatter was turned over to Sanders's original trial counsel. Sanders's new counsel claimed that the report was not included in the materials he received from Sanders's appellate counsel (who received the materials from Sanders's original trial counsel) and that the report was not discovered until July 2003. The report indicated that on September 5, 1997, which was the second day of trial, Detective Hatter was contacted by an anonymous caller claiming that Monique Camble knew who the real shooter was and that she overheard her brother, James Camble, planning the murder in the basement. The caller claimed that James Camble, Antoinne Riley, and Lemon tested the murder weapon in Monique's yard; that Lemon was the shooter; and that Sanders was not at the scene. The caller further alleged that Lemon disposed of the gun used in the shooting in Chicago. The caller also claimed that "Noonie" told her that Riley, Camble, and Lemon came to her house, which she shared with someone named Tera, after the shooting. She alleged that "Noonie and/or Tera" told the victim's wife, Tericita McFerrin, that Sanders was the shooter because they did not want to implicate the other three men. The caller also claimed that Tera informed Sheila Mitchell that Riley, Lemon, and Camble were responsible for the shooting and came to the house

of Tera and Noonie afterward. She alleged that Lemon went to Vanita Stegal's[3] house with the gun. The caller further claimed that Tericita McFerrin paid witnesses to implicate Sanders and that Lemon's and Riley's girlfriends knew the truth.

Although the anonymous caller was never identified, Detective Hatter attempted to follow up on the information. On September 8, Detective Hatter interviewed Lemon's girlfriend, Vanita Stegal, who confirmed that she was with Lemon on the night of the shooting, but stated that he did not admit his involvement. Hatter could not locate Tera, and although he concluded that "Noonie" was Qualisqua Franklin, she could not be located. The victim's wife denied being contacted by a Tera or Noonie regarding the shooting and further denied paying anyone to identify Sanders as the shooter.

Sanders's original trial counsel stated that he did not receive the report and did not remember discussing it with the prosecutor. He alleged that if he had received it, he would have requested an adjournment and performed further investigation. Sanders's appellate counsel testified that he received the case file from trial counsel. When asked whether he saw the report at the time the file was turned over, he replied "I'm going to say probably not." Appellate counsel no longer had the file, claiming that he gave it to Sanders in 2001 or 2002.

The prosecutor claimed that all police reports were forwarded to Sanders's trial counsel, and that she placed "a uniquely colored piece of paper in the file indicating what had been sent." The file contained a sheet indicating that all reports up to September 12, 1997, had been turned over to

---

[3]This person is referred to at some points in the report as "Banita."

defense counsel. The prosecutor also remembered speaking with defense counsel about the anonymous call prior to giving him the report. Defense counsel informed the prosecutor that he did not need any additional time because he had a witness, Rosco Manns, who would testify to the matters raised by the anonymous source.

The prosecution also sought to establish through a computer "diary" that it turned over the report to defense counsel. Sanders's counsel objected to the diary's entry and requested to have an expert examine the file in order to determine when the entry was made; the prosecutor objected to this request. The trial court stated that it would not consider this evidence and no examination was performed.[4]

The trial court denied Sanders's motion for relief from judgment, finding that "it [was] more probable than not that defense counsel had a copy of the report." Even if the report had not been turned over, the trial court found that there would have been no prejudice because the important information contained in the report—that Lemon was the shooter—was not new and had been covered by testimony at trial. Based on these rulings, the court held that Sanders's ineffective-assistance claims were rendered moot. The court also found Sanders's claim that Thelma Fry's in-court identification was unduly suggestive to be without merit, as she, along with the other witnesses implicating Sanders, testified consistently with their out-of-court identifications and were subject

---

[4]Although an order is not included in the record, the court concluded at the hearing on Sanders's motion to permit authentication of the computer diary that it would rule the diary inadmissible based on the security concerns cited by the prosecution. The prosecutor and Sanders's counsel then agreed to draft an order together.

to cross-examination. The trial court also rejected Sanders's arguments regarding favorable polygraph evidence and prosecutorial misconduct.

Both the Michigan Court of Appeals and the Michigan Supreme Court denied Sanders's application for leave to appeal because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Sanders*, 755 N.W.2d 629 (Mich. 2008).

## II.    Federal Habeas Proceedings

Sanders filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As to Sanders's *Brady* claim, the district court concluded that the state court reasonably chose not to credit trial counsel's testimony because he admitted that he did not recall receiving some other reports from the prosecutor and because the prosecutor testified that trial counsel stated that he would not ask for an adjournment.

Even assuming the report was not disclosed, the district court concluded that the state court's prejudice determination was not unreasonable, noting that the only allegation not addressed during trial was that the victim's wife paid witnesses to implicate Sanders. The district court reasoned that she would have simply denied the allegation if asked at trial, as nothing in the record suggested that she would have testified differently. Moreover, the district court noted that defense counsel had cross-examined witnesses at trial extensively about their identification of Sanders so as to raise questions about whether they falsely identified him as the shooter.

As to Sanders's allegation that the delay in the report's disclosure amounted to bad-faith destruction of potentially exculpatory evidence, the district court noted that the state court's ruling that the report was turned over undermined the factual basis for this claim. Although Sanders

requested an evidentiary hearing on the claim in order to examine the prosecutor's computerized diary, the district court found this request to be foreclosed by *Cullen v. Pinholster*, 131 S. Ct. 1388, 1389 (2011).

The district court held that the trial court reasonably determined that Sanders's due process rights were not violated by Thelma Fry's in-court identification at the preliminary examination on the following bases: (1) Fry had an adequate opportunity to observe the suspect at the time of the crime; (2) her account was detailed enough to demonstrate that she was paying attention to the shooter; (3) her description was not inconsistent with Sanders's actual appearance; (4) she never indicated that she was certain about her identification at the lineup, but stated at trial that she was 100% sure Sanders was the shooter (the only factor the district court found to favor Sanders); and (5) there was a minimal time lapse between the crime and the preliminary examination.

As to Sanders's ineffective assistance claims, the district court first determined that Sanders's trial counsel was not ineffective for failing to further investigate the allegations in the report because he presented a defense based on that information and brought it out on cross-examination. As to the claim that trial counsel was ineffective for failing to challenge Thelma Fry's in-court identification, the district court found that the decision to challenge the testimony at trial—where the judge was the fact-finder—rather than through a pretrial motion, was a reasonable tactical decision. The district court also rejected Sanders's claim that his trial counsel was deficient for failing to argue that the eyewitness identification was unreliable because there was a discrepancy between the witnesses' physical descriptions of him and his actual appearance, as trial counsel cross-examined witnesses on this subject. Likewise, the district court rejected Sanders's claim that his trial counsel performed

deficiently for failing to rebut testimony that Sanders refused to participate in a corporeal lineup because counsel successfully convinced the trial court not to consider this fact.

On Sanders's final claim—ineffective assistance of appellate counsel on direct appeal—the district court concluded that the state court did not unreasonably determine that the issues raised in the motion for relief from judgment were not "clearly stronger" than those asserted on direct appeal. As to Sanders's assertion that appellate counsel "inadequately presented" the two issues raised on direct appeal, the district court held that Sanders failed to explain how a different presentation would have rendered a different result.

**ANALYSIS**

## I.      Standard of Review

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), habeas relief may not be granted on a state claim adjudicated on the merits unless the state court's decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's determination is contrary to clearly established federal law if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Lovins v. Parker*, 712 F.3d 283, 294 (6th Cir. 2013) (alteration in original) (internal quotation marks omitted). An unreasonable application of Supreme Court precedent also occurs "if 'the state court identifies the correct governing legal principle . . . but unreasonably applies

-12-

th[e] principle to the facts of the . . . case.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

If a petitioner's claim arises under subsection (d)(2), the state court's factual findings "are presumed to be correct unless they are rebutted by clear and convincing evidence." *Fleming v. Metrish*, 556 F.3d 520, 525 (6th Cir. 2009). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

We review the legal basis for the district court's decision de novo, while its factual findings are reviewed under the clear error standard. *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008).

## II.  Discussion

### A.  Failure to turn over report

#### i.  Brady claim

Pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a defendant's due process rights are violated if the government suppresses exculpatory evidence material to either guilt or punishment. *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc). In order to establish a *Brady* violation, a defendant must show that: (1) the evidence is favorable, either because it is exculpatory or because it can be used for impeachment; (2) the government either willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced as a result. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice is established when the government's failure to disclose is "so serious that there is a reasonable probability that the suppressed evidence would have produced a

different verdict." *Id.* at 281. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (en banc) (internal quotation marks omitted).

The evidence contained in the report is undoubtedly favorable, as it suggested that Michael Lemon was McFerrin's shooter and raised questions regarding the credibility of the witnesses who implicated Sanders. The main point of contention is the state court's determination that the evidence was not suppressed. Sanders argues that the trial court's determination that the prosecution delivered the report to his trial counsel was unreasonable because counsel was aggressive and would have asked for an adjournment had the report been disclosed.

The trial transcript does reflect that Sanders's trial counsel engaged in vigorous cross-examination and was a strong advocate for his client. However, this was not the only information the trial court considered when deciding whether the report had been suppressed. The prosecutor testified that her office's color-coded system showed that the report was disclosed. She also described her discussion with Sanders's counsel about the anonymous caller and his witness who would address the issue. Her memory of the events was clearer, and Sanders's trial counsel did not remember receiving other police reports and admitted losing some documents related to the case. The court also pointed out that Sanders's counsel had been seen at trial with a large number of documents on the defense table, but that the file forwarded to appellate counsel was small enough to fit in a standard-sized envelope. Based on this testimony and information, it was not unreasonable for the state court to determine that the report had been disclosed. Moreover, testimony elicited from Detective Hatter at trial bolsters the state court's decision, as it suggests that the report, or at least

the information in it, had been shared with Sanders's trial counsel. The following exchanged

occurred between the prosecutor and Detective Hatter.

> Q: All right. Now, . . . when did you stop the investigation?
> A: Honestly, it hasn't stopped. It's been ongoing even through this trial.
> Q: And, why do you say that?
> A: 'Cuz we've gotten calls from anonymous individuals, one anonymous individual up until the week that we were last in session, regarding this case.
> Q: And, have you followed those calls up?
> A: I've attempted to, yes.
> Q: All right. And, to those people who are willing to give you names have you been able to get any information . . . that the shooter was anyone but Mr. Sanders?
> A: No.

Sanders's allegation that his trial counsel's silence on the record is probative cuts against him

here—if he had been unaware of the anonymous calls during the course of trial, surely he would have

objected. The fact that he did not do so is telling.

Although our analysis could end here, we will also address Sanders's alternative argument

that, assuming suppression, he was prejudiced. He contends that he suffered prejudice because the

State's case against him was very weak, pointing out that the four witnesses implicating him lacked

credibility; some expressed a desire to avenge McFerrin's death on any member of the Chicago

group; and no physical evidence connected him to the crime. There is no doubt that this case is

problematic. The witnesses' testimony—the basis of the guilt determination—was fraught with

issues of credibility and consistency. However, review under § 2254(d) "is a guard against extreme

malfunctions in the state criminal justice systems, not a substitute for ordinary error correction

through appeal." *Campbell v. Bradshaw*, 674 F.3d 578, 586 (6th Cir. 2012) (internal quotation

marks omitted). While we might have come to a different conclusion if evaluating this case on direct

-15-

appeal, we may not grant relief on habeas review unless "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). Trial counsel engaged in intensive cross-examination in order to bring the credibility matters to the forefront. The state court, which served as the trier of fact, discussed in detail its evaluation of these witnesses' credibility. Ultimately, however, the state trial court found their testimony persuasive enough on the points that mattered—what occurred and the identity of the shooter—to rely upon it in finding Sanders guilty. We cannot say that "there was no reasonable basis" for the state court to find that Sanders was not prejudiced by the alleged suppression of the report because the credibility issues with the witnesses' testimony were adequately explored at trial.

Moreover, the most helpful part of the report—the allegation that Michael Lemon was the shooter—was the defense used by trial counsel and was developed during cross-examination of the State's witnesses and on direct examination of the defense's own witnesses. It is difficult to say that "the withheld evidence 'would . . . have permitted the development of alternate theories or different lines of argument.'" *Apanovitch v. Bobby*, 648 F.3d 434, 440 (6th Cir. 2011) (quoting *Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2010)). Even assuming suppression, it is unlikely that duplicative presentation of this evidence "would have produced a different verdict." *Strickler*, 527 U.S. at 281.

Of course, Sanders contends that his trial counsel should have been given the opportunity to further explore the only allegation in the report *not* brought out at trial—that McFerrin's wife was paying witnesses to implicate Sanders. Although Sanders complains that Detective Hatter "did little

to investigate the information in the report," one thing that the detective *was* able to do was interview Tericita McFerrin, who explicitly stated that she had not paid witnesses to testify in a particular way. The value of this evidence, therefore, "would have been minimal at best," *Apanovitch*, 648 F.3d at 440, as there is nothing to indicate that she would have testified any differently on the stand.

### ii. Bad faith destruction claim

Alternatively, Sanders claims that the failure to disclose the report "resulted in the destruction of evidence due to the passage of time," amounting to a due process violation. A defendant suffers a denial of due process if the state, in bad faith, "fail[s] to preserve potentially useful evidence" and the defendant demonstrates "an inability to obtain comparable evidence by other reasonably available means." *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001).

Sanders's claim is hampered by the state court's finding, under its *Brady* analysis, that the report was disclosed. He argues, however, that the prosecution's refusal to let him examine the county's computer is suspect and that an evidentiary hearing could confirm the existence of prosecutorial bad faith. The district court denied his request for an evidentiary hearing, finding that because the state court's decision on the *Brady* claim was not unreasonable, its review was limited to the record that was before the state court pursuant to *Pinholster*. There, the Supreme Court held that "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before [the] state court." 131 S. Ct. at 1400. Sanders contends that review of this claim is not cabined by the constraints of § 2254(d) because he diligently

pursued it in state court and was foreclosed from fully developing it by the state court's evidentiary

ruling.[5]

Where *Pinholster*'s limitations are inapplicable, a federal court can appropriately consider

evidence outside the state-court record. For instance, when a federal court determines that a state

court's decision was unreasonable, and hence not subject to AEDPA deference, consideration of new

evidence not presented in state court is appropriate. *See, e.g.*, *Mosley v. Atchison*, 689 F.3d 838, 853

n.1 (7th Cir. 2012) ("*Pinholster* did not instruct lower courts to ignore [new] evidence after

determining that a state court's denial of relief was erroneous under the strict standards of §

2254(d)(1)."); *Johnson v. Finn*, 665 F.3d 1063, 1069 (9th Cir. 2011) (holding that because a state-

court decision "did *not* qualify for deference . . . , it was both lawful and necessary . . . to conduct

an evidentiary hearing" on petitioner's claim).[6] An evidentiary hearing may also be appropriate

when the state court has rejected a claim on procedural, as opposed to merit-based, grounds. *See,

e.g.*, *McClellan v. Rapelje*, 703 F.3d 344, 351 (6th Cir. 2013) ("*Pinholster* only applies to limit

consideration of additional evidence when the state court has previously decided the same merits

---

[5]In the context of his ineffective assistance of counsel claim, Sanders argues that *Pinholster* is inapplicable to claims alleging unreasonable factual determinations under § 2254(d)(2). Although *Pinholster* specifically addressed subsection (d)(1), subsection (d)(2), by its terms, also requires a federal court to limit its review to the record that was before the state court. *See* 28 U.S.C. § 2254(d)(2) (providing that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*" (emphasis added)).

[6]The *Pinholster* majority did not decide "whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied." 131 S. Ct. at 1411 n.20.

issue later presented to the federal court."); *see also Pinholster*, 131 S. Ct. at 1417 n.5 (Sotomayor, J., dissenting) ("Of course, § 2254(d)(1) only applies when a state court has adjudicated a claim on the merits."). What is less clear is the gray area resulting from *Pinholster*, which is conceptually illustrated by Sanders's argument. As this court recently observed, *Pinholster*

> suggested . . . that the prohibition on new evidence might not always apply, using as an example the hypothetical defendant who diligently pursues her claim through the state courts, but nevertheless presents a "new claim" in federal court because the court orders the production of evidence previously made unavailable during state court proceedings. The Supreme Court, however, has thus far declined to decide where to draw the line between new claims and claims adjudicated on the merits.

*Seaman v. Washington*, No. 10-2477, 2012 WL 5870126, at *3 (6th Cir. Nov. 21, 2012) (citations and internal quotation marks omitted).

Whatever the uncertainties created by *Pinholster* as to this question, this is not the case in which to decide it. *Accord Hanna v. Ishee*, 694 F.3d 596, 609-10 (6th Cir. 2012) (noting "*Pinholster*'s distinction between unexhausted claims and so-called 'new claims,'" which "neither this Court nor the Supreme Court has yet had occasion to develop," but declining to do so "because disposition of this issue is not required to deny relief on Petitioner's claim"). The claim regarding the computer "diary" is not new, but is a part of Sanders's claim that the report was not turned over. The district court found reasonable the state court's conclusion that the report was turned over, thus eviscerating the foundation of any bad-faith claim. Because Sanders has failed to demonstrate "that the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involv[ing] an unreasonable application' of federal law, a writ of habeas corpus 'shall not be granted' and our analysis is at an end." *Pinholster*, 131 S. Ct. at 1411 n.20 (citation omitted).

## B.      Suggestive in-court identification

Sanders contends that Thelma Fry's identification at the preliminary examination was unnecessarily suggestive and resulted in a violation of his due process rights. In order to determine whether a defendant's due process rights have been violated based on an identification procedure, a court asks: (1) "whether the identification was unnecessarily suggestive" and, if so, (2) "whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure." *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007). The second inquiry considers the following factors:

> (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention;
> (3) the accuracy of the witness' prior description of the criminal; (4) the level of
> certainty demonstrated by the witness at the time of the identification; and (5) the
> time between the crime and the identification.

*Id.* These factors are weighed against "the corrupting effect of the suggestive identification itself."
*Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Sanders disagrees with the district court's rejection of his claim, but other than noting facts favorable to him, he does not explain how a different analysis demonstrates the unreasonableness of the state court's decision. And in contrast to the assertion in Sanders's brief, Fry's identification of Sanders at the preliminary examination was not the first time she noted his resemblance to the shooter. Fry indicated during the lineup that Sanders looked like the shooter, although she ultimately did not make a positive identification. Under similar circumstances, we have held that a petitioner's due process rights were not violated. In *Owens v. Foltz*, 797 F.2d 294 (6th Cir. 1986), neither of the victims positively identified the petitioner—who was suspected of robbing their home—at a lineup,

although they "separately told the officer in charge of the lineup that they were 'pretty sure' and '75% sure' that [the petitioner] was one of the robbers." *Id.* at 295. At the preliminary examination, the victims identified the petitioner as one of the robbers, although he and his co-defendant were the only black men in the room and were seated at the defendants' table. *Id.* This court found that "[t]he identification procedure was not so suggestive as to rise to the level of a constitutional violation" based, in part, upon the fact that "[t]he basis of [their] identification was thoroughly examined by defense counsel at the time of trial." *Id.* at 296. Here, not only did the judge—the trier of fact in this instance—understand the circumstances surrounding Fry's identification, defense counsel cross-examined Fry on the lack of certainty in her various identifications. Under this set of facts, we agree with the district court's conclusion that the state court did not unreasonably apply Supreme Court precedent in determining that Sanders's due process rights were not violated by Fry's in-court identification.

Sanders contends, however, that Fry "recanted" her testimony in her post-trial affidavit, offering this as evidence of the suggestive nature of her identification. In this affidavit, Fry explained that it was night when she witnessed the shooting; the suspect was 15 to 20 feet away; she did not get a good look at his face; got a better look at his "body shape and posture"; and "would have been better able to make an identification in a physical line up than in a photo line up." She further stated that "at the time of this shooting and trial, I was on drugs and living on the run. . . . I believe all this stress added to the possibility that I made a mistake in identifying Sanders. I believe it is very possible that I identified the wrong person."

Fry's allegations that she was on drugs and under stress at the time of the shooting and at trial are troubling and cast greater doubt on the reliability of her testimony. Her statements, however, do not amount to an outright recantation. Moreover, they are not inconsistent with Fry's previous testimony, during which she claimed that she was more familiar with the physical characteristics of the shooter. And as previously noted, cross-examination highlighted the uncertainties of Fry's previous identifications.

Even discounting Fry's testimony, there were three other witnesses implicating Sanders, including two that were in the car when the victim was shot. If we assume that Fry's testimony violated due process principles, its admission would be evaluated under harmless-error analysis. *See, e.g.*, *United States v. Wade*, 388 U.S. 218, 242 (1967). The state court's reliance on other witnesses' testimony implicating Sanders would have provided an alternate basis for the guilty verdict. Because "'fairminded jurists could disagree' on the correctness of the state court's decision," *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)), the district court did not err in declining to grant the writ on this claim.

### C. Ineffective assistance of trial counsel

In order to establish ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance was deficient; and (2) that he or she was prejudiced by this performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The first prong requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Kinnard v. United States*, 313 F.3d 933, 935 (6th Cir. 2002). "Prejudice" means there is a "reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *United States v. Taylor*, 489 F. App'x 34, 41 (6th Cir. 2012) (internal quotation marks omitted). In other words, a court should look to whether the seriousness of counsel's errors deprived the defendant of a fair trial. *Kinnard*, 313 F.3d at 935. A court is free to "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," as opposed to first determining whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

The state court determined that Sanders's ineffective-assistance claims were rendered moot by its ruling on the *Brady* issue that Sanders could not demonstrate prejudice. In effect, this was a merits determination of these claims. *See Harrington*, 131 S. Ct. at 784-85 (allowing federal courts to presume that a state court claim is adjudicated on the merits absent "any indication or state-law procedural principles to the contrary").

### i. *Failure to investigate information contained in the report*

Sanders argues that *if* trial counsel received the report, his performance was deficient for failing to investigate the allegations contained in it and that this prejudiced him because the prosecution's case was very weak. As the district court held, the state court's rejection of this claim was not unreasonable. Trial counsel presented a defense based on the most probative information contained in the report—that Michael Lemon was responsible for the murder. Counsel questioned Detective Hatter regarding his investigation into Lemon's possible involvement. Monique Camble testified that Sanders stayed at her house the night of the murder and that, while he was in and out of the house during the course of the evening, he never left with James Camble, Antoinne Riley, or Michael Lemon. Rosco Manns testified that he was with Sanders at Monique Camble's house on

the night of the shooting and that Lemon claimed responsibility. Lee Logan stated that he was on a porch a few doors down from where the shooting took place and that Sanders was not the shooter. Tamica Cohen, the mother of one of McFerrin's children, testified that although she did not witness the shooting, she saw James Camble and a short man who was not Sanders running through an alley toward a house in which women named Noonie and Tara lived. It is true that there was no questioning about whether McFerrin's widow paid witnesses to implicate Sanders but, during the investigation of the report, she denied the claim. This evidence, therefore, has little, if any, value in the context of our analysis, which requires that counsel's mistakes or failures prejudice the petitioner. More importantly, trial counsel was able, through extensive cross-examination, to sufficiently highlight the credibility problems of those witnesses who implicated Sanders as the perpetrator at trial. Because trial counsel brought out the vast majority of the information contained in the report during cross-examination, even assuming that he was deficient for failing to investigate matters further, it cannot be said that "there was no reasonable basis" for the state court's rejection of this claim. *Pinholster*, 131 S. Ct. at 1402 (internal quotation marks omitted).

ii.     *Failure to challenge Thelma Fry's in-court identification*

Sanders contends that his trial counsel was ineffective because he failed to challenge the constitutionality of Thelma Fry's in-court identification. However, this was a bench trial, and as the State points out, there is no authority holding that challenging a witness's identification of a suspect at trial, rather than in a preliminary motion, constitutes deficient performance. Cases reach the opposite conclusion. *See, e.g., Brown v. Lafler*, No. 09-10852, 2010 WL 5148498, at *9 (E.D. Mich. Dec. 14, 2010) ("The decision to attack the credibility of the victim's identification of Petitioner

through the examination of witnesses at trial, rather than by filing a pre-trial motion to challenge the suggestiveness of the identification procedure, was a reasonable trial strategy. This is true especially in view of the fact that the trial was to the bench, before a judge as fact-finder . . . ."). And as discussed previously, Sanders's trial counsel thoroughly cross-examined Fry at trial, fully exploring her identification of Sanders at the preliminary examination. Therefore, Sanders is not entitled to relief on this claim.

### iii. Failure to impeach witnesses' trial identification of Sanders

Sanders contends that trial counsel was ineffective for failing to question witnesses about a discrepancy between the physical description of Sanders in a police report and his actual physical characteristics. The police report stated that the suspect was between 5'10" and 6' and weighed approximately 170 pounds. Sanders notes that he was 5'8" and weighed 135 pounds at the time of his arrest. As the State points out, the description in the police report was not attributable to any particular individual, and it is unclear how it could have been used to impeach the witnesses' testimony. More importantly, however, trial counsel cross-examined witnesses about Sanders's appearance. Trial counsel's failure to question each witness regarding the particulars of the description in the police report as compared to Sanders's actual physical characteristics did not "fall below an objective standard of reasonableness," *Miller v. Straub*, 299 F.3d 570, 578 (6th Cir. 2002), nor can we say that it prejudiced Sanders.[7]

---

[7]Sanders also argues that trial counsel was ineffective for failing to use a statement made by Darlynzo Brown prior to the preliminary examination to impeach him. Trial counsel recorded the answer on a piece of paper, lost it before trial, and then found it later. This statement was apparently inconsistent with Brown's trial testimony. However, as noted by the State, Brown was impeached

>            *iv.*      *Failure to call lineup attorney as a witness*

Although Sanders contends that trial counsel's performance was deficient for failing to call the attorney representing Sanders at the lineup so that counsel could explain that he—not Sanders—called the lineup off, he concedes that the trial court stated it would not consider the reasons for the lineup's cancellation.  After obtaining a favorable ruling by the trial court, there would have been no reason for trial counsel to go further and actually call the attorney as a witness. Sanders cannot establish either deficient performance or prejudice under these circumstances.

**D.      Ineffective assistance of appellate counsel**

A criminal defendant has a right to effective assistance of counsel in connection with his or her direct appeal.  *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).  Appellate counsel need not raise every non-frivolous claim on direct appeal, however.  *Id.*  The Supreme Court has stated that "winnowing out weaker arguments on appeal . . . is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks omitted). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  *Monzo*, 281 F.3d at 579 (internal quotation marks omitted).  As with Sanders's ineffective assistance of trial counsel claims, his ineffective assistance of appellate counsel claims were rejected based on the state trial court's rulings on other issues. Again, we may presume that these claims were adjudicated on the merits.  *See Harrington*, 131 S. Ct. at 784-85.

---

by counsel with other prior statements conflicting with his testimony at trial; it is unclear how counsel's failure to utilize this additional statement prejudiced Sanders.

*i.* *Failure to raise habeas issues on direct appeal*

Sanders argues that two issues—the prosecution's alleged failure to disclose the police report and Thelma Fry's in-court identification of Sanders at the preliminary examination—which were not raised by appellate counsel on direct appeal, require a finding of ineffective assistance.

As to the disclosure-related issues, Sanders's main claims assume that the prosecution did not disclose the report. It is difficult to imagine how his appellate counsel could have been deficient for failing to raise these issues, as he received the case file from trial counsel and would have assumed that it was complete. Moreover, based on the information contained in the report, which was largely duplicative of the evidence presented at trial, it does not appear that the *Brady* and bad-faith destruction claims were "clearly stronger than those presented" on appeal. *Monzo*, 281 F.3d at 579.

If we review Thelma Fry's in-court identification of Sanders and the related issues involving trial counsel's impeachment of witnesses for ineffective assistance, it is not clear that these claims would have fared better than the general challenge to the sufficiency of the evidence, where the reviewing courts were asked to analyze the evidence as a whole. The validity of Fry's identification, as well as that of the other witnesses, was obviously challenged by trial counsel through cross-examination, and the reviewing state court would have evaluated these aspects of the record in the course of its sufficiency review. As with the disclosure issue, this issue is not clearly stronger than those which were raised.

> ii.     *Failure to adequately brief issues raised on direct appeal*

The Michigan Court of Appeals rejected Sanders's claims on direct appeal (1) because James Camble's testimony was not newly discovered evidence; and (2) based on the strength of the prosecution's case. *See generally Sanders*, 2001 WL 1547916. Other than a disagreement with the state court's ruling and conclusory statements regarding appellate counsel's performance, Sanders does not demonstrate any way in which a different presentation of his claims would have altered the state court's decision such that his appellate counsel's performance could be judged deficient and Sanders prejudiced. The state court's decision to reject this claim was not unreasonable, and we therefore agree with the district court's conclusion that modification of appellate counsel's strategy could not have changed the record on which the state court made its decision.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.