<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 18a0047n.06

Case No. 16-2638

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DANIEL JOHN PITTAO,                    )
                                       )
    Petitioner-Appellant,              )
                                       )
v.                                     )
                                       )
BONITA J. HOFFNER,                     )
                                       )
    Respondent-Appellee.               )

**FILED**
Jan 23, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: CLAY, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. A Michigan jury convicted Daniel Pittao for the murder of his estranged wife. Unsuccessful in his appeals and his habeas petition, Pittao raises issues here concerning due process and ineffective assistance of counsel. Because the Michigan court did not unreasonably apply federal law in rejecting Pittao's claims, we AFFIRM the denial of his habeas petition.

## I. BACKGROUND

After a previous trial ended in a hung jury, a Michigan jury convicted Pittao of the first degree murder of his wife, Tamara Pittao. The Michigan Court of Appeals affirmed his conviction, and the Michigan Supreme Court denied leave to appeal. *People v. Pittao*, No. 290690, 2010 WL 3604423, at *1 (Mich. Ct. App. Sept. 16, 2010) (per curiam); *People v. Pittao*, 819 N.W.2d 888 (Mich. 2012) (mem.). The district court denied Pittao's habeas petition, but granted a certificate of appealability on certain of his due process and ineffective assistance claims. *Pittao v. Rivard*, No. 13-CV-14367, 2016 WL 3548028, at *19 (E.D. Mich. June 29,

2016); *Pittao v. Rivard*, No. 13-CV-14367, slip op. at 10 (E.D. Mich. Nov. 7, 2016). This appeal follows.

Police discovered Tamara Pittao's body in her apartment on Thanksgiving morning in 1997. They found no evidence of a burglary, struggle, or sexual assault. Tamara's throat had been slit, and an examination revealed that she had also been asphyxiated. Based on her last known contact with another person, the last use of her computer and phone, and the condition of her body, the investigators concluded that she had been killed during the afternoon of November 24, 1997. At the time of the murder, Daniel and Tamara Pittao were separated and she had recently filed for divorce following a domestic violence incident. Daniel Pittao also faced a pending charge for assaulting his son from a prior marriage; Tamara Pittao witnessed that incident. At trial, the prosecution presented evidence of those events as well as evidence of other marital discord and violent acts towards his first wife.

The defense argued at trial that the police inappropriately focused their investigation on Daniel Pittao and biased witnesses against him. Although Pittao denied visiting Tamara's apartment the week of the murder, a witness from the apartment complex, David Jerome, testified that he saw him at a dumpster outside her apartment building the afternoon of November 24. Jerome testified that as he was bringing trash to the dumpster, Pittao appeared suddenly and looked surprised to see Jerome. According to Jerome, Pittao then ducked behind a black or blue Chrysler vehicle. At the time of the murder, Pittao drove a blue Jeep Cherokee. Jerome later identified Pittao from a photo array and, at trial in 2008, testified that he had "no

doubt" the photograph of Pittao he identified was of the same man he saw at the dumpster. Jerome testified by videotape at trial because he could not travel for health reasons.

Pittao worked in Michigan for Intertec, an automotive supplier, and had a meeting scheduled with General Motors on November 25, 1997. Although trial evidence showed that he was not at his office on the afternoon of November 24, Pittao contends that Joyce Willett, who worked at an Intertec office in Kentucky, would have testified that she was in contact with him throughout that day in preparation for the General Motors meeting.

## II. DISCUSSION

On appeal from the denial of habeas relief, this court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Scott v. Houk*, 760 F.3d 497, 503 (6th Cir. 2014). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to uphold state court adjudications on the merits unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Federal courts must presume state courts' factual findings to be correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**A.**

Jerome testified at trial that he identified Pittao from a photo array as the man he saw near the dumpster outside Tamara's apartment on the day of the murder. Pittao maintains that the admission of Jerome's pretrial identification violated due process because the identification resulted from suggestive police procedures. Identification procedures raise due process concerns "only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Williams v. Bauman*, 759 F.3d 630, 638 (6th Cir. 2014) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012)). Unnecessary suggestiveness generally depends on whether police conduct directed the witness's attention to a suspect. *Howard v. Bouchard*, 405 F.3d 459, 469–70 (6th Cir. 2005). If the defendant proves that the identification procedures were impermissibly suggestive, the court "must determine whether, under the totality of the circumstances, the testimony was nevertheless reliable." *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

The Michigan Court of Appeals decided that because Pittao "failed to identify an improper identification procedure, there [was] no need to establish an independent basis for Jerome's identification." *Pittao*, 2010 WL 3604423, at *3. In seeking habeas relief, Pittao argues that several police actions collectively show impermissible conduct. But whether considered separately or together, those incidents fail to establish that the Michigan court unreasonably applied federal law or based its decision on an unreasonable determination of the facts.

4

First, Pittao asserts that the police acted improperly when they posted a picture of a Jeep Cherokee at an informational meeting at Tamara's apartment complex after the murder, though he pinpoints nothing at the meeting linking him with the Jeep. Additionally, three witnesses testified that the police presented photographs of at least two different vehicles at the meeting. Jerome testified that the police showed pictures of three or four vehicles and that he picked out the Jeep because it was the only Chrysler product. Police Chief David Molloy and Detective Todd Anger testified that the police posted pictures of a Jeep and a Chevrolet Blazer at the meeting. Molloy further testified that the police never revealed "any suspect information at the meeting." Thus, Pittao identifies no facts to support his contention that the police directed any witness's attention to him at the meeting.

Second, Pittao claims the police acted impermissibly when they accompanied Jerome to the Jeep section of a Chrysler dealership. Jerome testified that the police took him to a dealership, but struggled to recall the details of that trip. When asked whether the police took him to other dealerships or showed him other types of cars, Jerome testified, "I believe they showed me others, but I can't believe--I cannot recall what it was or where we did. . . . I cannot say for sure. . . . It was a long time ago." Further, Jerome explained that he identified Pittao's picture because of his eyes and hair, not because of the Jeep: "[T]he eyes and the hair . . . were a dead giveaway." He also affirmed that the police never suggested which photograph to choose, and he learned only later that Pittao was the man he identified in the picture. Pittao fails to show improper steering here.

Third, Jerome wrote a brief statement for the police recounting that he saw a man by the dumpster on November 24, but he crossed off that date and changed it to November 25. Pittao argues that this edit suggests that the police influenced Jerome's testimony regarding the date. But the record shows that the police simply asked Jerome to check the correct date. Jerome recalled looking through some of his papers with the police and testified that his correction related to mixing up the date of a doctor's appointment: "I believe I was going to look through my paperwork to be sure of the date. I don't believe I handed [the police] anything. . . . Later, I looked up the date of my appointment was the 25th, not the 24th, and I--I thought the 25th was on a Monday, but it wasn't." Pittao theorizes that the police told Jerome that the murder occurred on November 24. But Jerome could not remember who told him when the murder happened or when he learned that information. In short, Pittao highlights no evidence that the police guided Jerome to the 24th.

Finally, Pittao also contends that Jerome's identification "morphed" over time. Absent improper police conduct, however, the jury assesses the reliability of the identification. *Perry*, 565 U.S. at 245 ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness."). Thus, to the extent that Jerome's identification changed over time, inconsistencies went only to the weight of his testimony, not its admissibility. Because Pittao fails to pinpoint any impermissibly suggestive police procedure—much less any basis to hold Jerome's testimony otherwise unreliable—we

conclude that the Michigan court did not unreasonably apply federal law or base its decision on an unreasonable application of the facts.

**B.**

Pittao argues his counsel provided ineffective assistance in not seeking to suppress Jerome's identification. To prevail on a claim of ineffective assistance, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Because the question is whether the Michigan court unreasonably applied the *Strickland* standard, Pittao must demonstrate that the court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The Michigan Court of Appeals determined that because Pittao failed to identify improper identification procedures, "any motion to suppress Jerome's identification testimony would have been futile" and counsel was "not ineffective for failing to file a futile motion." *Pittao*, 2010 WL 3604423, at *3. And although his counsel never moved to suppress Jerome's identification, he thoroughly challenged the identification by cross-examining Jerome regarding the vehicle he saw on the date of the murder, the photographs shown at the informational

7

meeting, the trip to the Chrysler dealership, his description of Pittao, and how he learned about the murder date.

Because Pittao cannot demonstrate that improper police conduct rendered Jerome's identification unreliable, his counsel's decision to challenge the identification through cross-examination rather than a motion to suppress was not unreasonable, let alone prejudicial. *See Sanders v. Curtin*, 529 F. App'x 506, 520 (6th Cir. 2013) (challenging credibility of witness's identification through cross-examination, rather than in a preliminary motion, did not constitute deficient performance).

## C.

Pittao next claims his trial counsel provided ineffective assistance in failing to investigate and produce his Intertec colleague, Joyce Willett, as an alibi witness. He insists that her testimony along with Intertec's phone records would have established that he was in his office on the afternoon of the murder. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. This duty includes "the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). In an ineffectiveness case, a "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Defense counsel is not required "to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Failing to call a known alibi witness, however,

"generally would constitute ineffective assistance of counsel." *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004).

With his petition, Pittao submitted affidavits from Willett, his sister, and himself regarding the alleged failure to investigate and call Willett. Willett's affidavit avers she and Pittao worked in different Intertec offices, but that they were scheduled to attend a meeting together at General Motors on November 25, 1997. Her affidavit describes work she and Pittao would have performed in advance of the meeting, but reveals no specific recollection of when any particular conversation would have occurred:

> 8. I do not have a specific recollection of when any particular conversation would have taken place on 11/24/97 in anticipation of the Tuesday meeting, however, I am quite certain that we would have done planning-type phone calls throughout the day on 11/24/97.

> 9. In addition to phone calls, I am fairly confident that Mr. Pittao would have fax'd me one or more documents in anticipation of the Tuesday trip, most likely on Monday, including the blank GM appearance approval form to be filled out for Delmet, and directions from Detroit Metro Airport to the Tech Center. I would have fax'd him my travel itinerary. . . .

Willett's affidavit also states that Pittao "appeared to be his 'normal' self" when she saw him at Tuesday's meeting.

In his own affidavit, Pittao explains that on November 24, 1997 he was working from his office at Intertec in Southfield, Michigan, and that he was in "phone and fax contact with employees from our Bardstown, Kentucky facility, including Joyce Willett," regarding the General Motors presentation the following day. His attorney instructed him to get the contact information for the Bardstown employees and his sister, Julie, supplied that information to the

attorney. Julie Pittao's affidavit affirms that she provided the employees' contact information and that counsel instructed her "not to contact them further, that he would be contacting them." She also attests that she communicated with Joyce Willett and other Bardstown employees (who she does not name) and that they were "friendly and cooperative and willing to help."

The Michigan court decided that counsel was not ineffective because Willett's testimony "only would have established that she spoke to Daniel Pittao on the telephone at some unspecified time on Monday, November 24, 1997." *Pittao*, 2010 WL 3604423, at *5. As the court explained, the absence of Willett's proposed testimony was not prejudicial because it was consistent with the prosecution's theory at trial:

> At trial, Daniel Pittao's coworker testified that Daniel Pittao was at his office during the morning on Monday, November 24, 1997, but was not there that afternoon. Daniel Pittao's office computer showed that the last activity that day occurred at 12:42 p.m. The prosecution's theory was that Tamara Pittao was killed later in the afternoon of November 24, 1997. Evidence was presented that the computer in Tamara Pittao's apartment was last used at 2:17 p.m. that day, and telephone records indicated that the last call placed from her apartment that day was made at 1:53 p.m. Willett's proposed testimony would not have prevented the jury from consistently finding that Willett spoke to Daniel Pittao when he was at his office during the morning of November 24, 1997, and that Daniel Pittao killed Tamara Pittao later that afternoon, when, according to other evidence, Daniel Pittao was away from the office and Tamara Pittao likely was killed.

*Id*. The court further determined that Willett's observations about Pittao's demeanor at the meeting on November 25 failed to provide a substantial defense, especially because other testimony indicated he was "emotionless when telling others about Tamara Pittao's death and at her funeral." *Id.* at *6.

Pittao highlights nothing that demonstrates the Michigan court unreasonably applied federal law or based its decision on an unreasonable determination of the facts. As far as his counsel's performance, none of the three affidavits shows that defense counsel failed to investigate this alibi. Indeed, according to Julie Pittao's affidavit, counsel agreed to contact the Bardstown employees. Additionally, in a recorded phone call Pittao told his secretary that he was in the office until 2:00 p.m. on November 24. Thus, defense counsel may have concluded that rather than contradicting Pittao's own statements—as well as the other compelling evidence indicating that he was out of his office—a better strategy was to rely on their expert medical witness who cast doubt on the prosecution's timeline by testifying that Tamara likely died on November 25 or 26. *See Harrington*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.").

Pittao also cannot satisfy *Strickland*'s prejudice prong. Willett's affidavit states only that she would have spoken with Pittao at some point on November 24, but acknowledges she had no "specific recollection" of when that call would have occurred. Pittao claims Willett's testimony together with the phone records would have furnished a complete alibi, but the phone records afford him no help. Although people from Pittao's office called other Intertec plants on November 24, Pittao's secretary, who administered the office phone system, testified that the phone system could not identify who actually made those calls. Accordingly, neither Willett's proposed testimony nor the phone records could verify that Pittao was in his office on the afternoon of the murder. Because Pittao fails to show that the Michigan court unreasonably

11

applied the *Strickland* standard, the district court correctly denied his petition. *See Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) ("A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant.") (citations omitted).

## III. CONCLUSION

We AFFIRM the district court's denial of Pittao's petition for a writ of habeas corpus.